The opinion of the court was delivered by
Tilghman, C. J.
This is a qui tarn action, brought for the recovery of certain penalties, for the shipping, and exporting, by the defendant, of a quantity of condemned staves, 'called cullings, from the port of Philadelphia to the port of Wilmington, in the state of Delaware. And the single question is, whether such exportation be within the prohibition of the act of 21st April 1759, (1 Sm. L. 222.) This act is entitled “ An act to prevent the exportation of bad, or unmerchantable staves, heading, boards, and lumber.” In the 1st section, after reciting, that “ the reputation of this province hath been much advanced by the care of the legislature to prevent frauds and abuses in divers commodities of our country produce exported to foreign markets, and yet some further regulation, is, by experience, found necessary, to promote the interests of trade and the gopd of the province,” it is enacted, “ that no merchant, or other person or persons whatsoever, shall, from and after the publication of this act, take or put on board any ship or vessel, any staves, heading, boards, plank, or lumber, for exportation out of this province, before he shall first submit the same to the examination of the officers,” &c. &c. It cannot be denied that the case falls within the words of the law, because, although the proprietaries of Pennsylvania were also proprietaries of the three lower counties of New Castle, Kent and Sussex on the Delaware, and both were under the same governor, yet the legislatures of the province and counties were, in the year *91 1759, -and totally independent of each other, and so continued until the revolution in 17†6, when each became a sovereign, independent state. But, it is contended, that the intent of the act, is explained by the preamble, which is confined to an exportation to foreign markets. If the question had rested on the expression foreign markets, the defendant would have had much to say for himself, though even then, it would not have been far from difficulty. A‘'country governed'by the same king, would not, strictly speaking, be a foreign country. And yet without doubt an ex-■portatipn .to the British West India Islands, must have been ■ considered as within the provision- of the act, because the principal markets for staves, &c. were in those islands,, and yet, they were subject to the same king as- Pennsylvania. Construing the word, foreign, with greater latitude, it might extend to all countries beyond sea, without considering whether subject to the same sovereign or not, and carrying its signification to its utmost '. extent, it might include all countries and governments, other than the province of Pennsylvania, wherever situate. The main intent of the act was, to make Pennsylvania staves more valuable by keeping up their character in consequence of their quality. The same Observation applies to all other articles, which by various laws were made subject to inspection, — such as bread and Hour, beef and pork, butter and lard, .bark, fish, flaxseed, &c. I have examined all these acts and they are expressed, pretty much as the one novy under consideration. . They prohibit exportation out of the province, or (since the revolution,} out of the state. The words, out of the province are so-plain, that they seem manifestly Intended to define the limits beyond which all markets should be deemed foreign markets. Unless we adhere to the line prescribed by the act, (the boundary of the province,} where are we to stop, and what exceptions are’we to make ? New Jersey is as near to us as Delaware — and Maryland joins, both Delaware and Pennsylvania. The counsel for the plaintiff, says, that none of the old thirteen colonies df Great Britain, which afterwards confederated' and established their independence, could be called foreign markets within the meaning of this act of assembly. Now see to what this would lead. Pennsylvania exported large quantities of flour, to the eastward, and southward — to Massachusetts and the Carolinas. Was it hot of great importance, that the character of her staple, should be kept up in those markets ? And is it -not of great importance still ? The coasting trade is of immense value. We have rivals in our sister states, and have already been much injured in our trade to Boston, by a relaxed inspection of flour. Suppose it should be decided, that our inspection laws do not extend to exportations to the state of Delaware. Would it not be very easy to carry our condemned flour, to Wilmington, or New Castle, and ship it there to foreign ports, to our great discredit,vand injury ? The same may be said of every article which is *92 subject to inspection. So that we shall find, upon reflection, that our ancestors knew what they were doing, when they used the words out of the province, and this will appear more clearly when we advert to an act passed in the year 172Í, “ For the well tanning and-curryingoí7eaí/íer,”&c. (1 Weiss, L.79.) Thisactdeclares, “that it shall not be lawful for any person or persons to lade, ship, or carry, in any ship or vessel, entering and lading in any part of this province, any leather or raw hides, with intent to transport, or convey the same to any place or places out of the province, except such as may be carried to the province of New Jersey, and counties of New Castle, Kent and Sussex on Delaware, to be wrought up there, &c. This shows that the legislature considered New Jersey, and the counties on Delaware, as embraced by the expressions out of the province, and therefore it was, that they expressly excepted them. The other colonies, pursued, in their inspection Jaws, the same policy as Pennsylvania. Each took care of itself, and considered its neighbours, quoad hoc, as foreigners. The counsel for the plaintiff cited the -laws of Connecticut with respect to beef and pork. And I have examined the act for the inspection of tobacco,^passed in Maryland in the year 1763. The words are these, “ All tobacco which shall be exported out of this province, shall be first brought to some or one of the public warehouses, and shall be there viewed and inspected, &e.”
It has been objected, that great quantities of staves, &c. are carried down the Susquehanna to tide water, and thence to -Baltimore, without inspection. I agree that these staves are not within the law. In the year 1759, I believe I may confidently say, no loaded vessel of any kind liad ever passed down the Susquehanna to the tide waters. The activity and enterprise of our citizens have produced a great change. A new scene has opened on those waters. A vast deal of lumber of all kinds goes down now, though chiefly in rafts. Much of it goes to Baltimore, where, if exported to foreign ports, it undergoes inspection. The act of 1759, cannot be fairly applied to a subject which did not then exist. Its provisions were intended for the waters of the Delaware, as will appear by an analysis of the act. But that question not being before us, I need pursue it no further. Something was said of the constitution of the United States, and a suggestion was thrown out, that perhaps the act of 1759, was in collision with it. But I cannot think so. Congress has the right of regulating trade, but the right of passing inspection laws is reserved to the individual states. In article 1. sect. 10. of the constitution, it is declared, “that no state shall, without the consent of the congress, lay any imposts or duties, on imports or exports, except what may be absolutely necessary for executing its inspection laws,” &c. and in conformity with this reservation, inspection laws have been passed by all the states who thought them necessary. As our opinion differs from that of the District Court, I have gone more fully into this subject *93 than I should otherwise have done. I am of opinion that the judgment should be reversed, and a venire de novo awarded.
Judgment reversed and a- venire de novo awarded.